UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PATRICK BELL,

    Plaintiff,

    v.

ESTRADA; et al.,

    Defendants.

No. C 04-4409 SI (pr)

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Patrick Bell, formerly an inmate at the Alameda County Jail, filed this pro se civil rights action in which he alleged he was subjected to an unlawful arrest. The matter is now before the court on the defense motion for summary judgment. The court will grant the motion and enter judgment against plaintiff.

## BACKGROUND

This case concerns a warrantless arrest of Patrick Bell by Oakland police officers Brett Estrada and Noah Montgomery on October 25, 2003. At the time, Bell was on parole on October 25, 2003 for grand theft to a person. His parole conditions included a provision that he and his residence and any property under his control could be searched without a warrant.

Bell provides very few details of his arrest. In his complaint, Bell alleged that police officers "stopped plaintiff as he was walking down the sidewalk without a substantial reason." Complaint, p. 3. He states that they "searched me and found no incriminating evidence. I was

arrested based upon the fact I supposively [sic] lied about my parole and address." Complaint, p. 3. His amended complaint was no more specific, as he alleged that officers Estrada and Montgomery "stopped plaintiff while walking on the sidewalk and they had no initial basis for the stop and arrested plaintiff without probable cause." First Amended Complaint, p. 3. In his declaration, Bell again states that he "was walking down the sidewalk and was detained and arrested by defendants. [¶] The defendants declarations and police report does not reveal a founded suspicion by defendants before the approached plaintiff and supposively observed signs of plaintiff on drugs." Bell Decl., ¶¶ 4-5 (grammar and spelling errors in source).

Defendants agree that they arrested Bell on the day in question. In contrast to Bell's very sketchy description of the events, defendants present a much more detailed explanation of why they did so and of the events that transpired that day. Their version is as follows:

Officers Montgomery and Estrada were patrolling the streets of Oakland at about 1:00 p.m. and saw Bell as they drove down the 800 block of West MacArthur Boulevard in Oakland. Officer Montgomery recognized Bell from prior contacts with him. Officer Montgomery was familiar with the 800 block of West MacArthur Boulevard, a block "well known for having heavy narcotic activity at all times of the day and night." Montgomery Decl., ¶5. Montgomery "suspected that that [sic] Bell was on parole for a narcotic related offense based on my prior contacts with him." Id. Montgomery described their encounter:

> I approached Mr. Bell and observed that he was showing signs of being on drugs, i.e., rapid speech, fidgety movements, sweating etc. I asked him if he was on parole. He stated that he was not on parole. I suspected that he was not telling me the truth and ran his name via the patrol car laptop computer which is directly connected to the CLETS wants and warrants system. I confirmed that Mr. Bell was in fact on parole. When I confronted him with that information, he continued to deny being on parole. I told him that I would call Sacramento for further confirmation of his parole status and then he said "Ok, I am on parole."
>
> Having learned that Mr. Bell was on parole, I instructed him to submit to a urine test pursuant to the Anti-Narcotic Testing condition of his parole. Mr. Bell refused to let me perform any field sobriety tests and refused to submit to a urine test. Bell also refused to give me his current address and stated that he was homeless.
>
> I contacted the Fugitive Apprehension Team ("FAT"), spoke to a parole officer on duty and informed him of the circumstances surrounding my contact with Mr. Bell. The parole officer placed a parole hold on Bell pursuant to Penal Code Section 3056 for providing false information to an officer regarding the status of his parole and refusing to submit to the anti-narcotic testing in violation of the terms and conditions of his parole.

2

> I am also familiar with California State law that permits a parolee to be searched or seized any time by a law enforcement officer without a warrant.
>
> I arrested Bell for a parole violation and Officer Estrada and I transported him to the Oakland City Jail.

Montgomery Decl., ¶¶ 6-9. Officer Montgomery was familiar with what constituted a violation of parole. He knew that a parolee had to have an address and refusal to provide an address to a peace officer was a violation of parole, as were providing false information to a police officer and refusing to submit to anti-narcotics testing.

When officer Estrada observed Bell, he recognized him "from prior contacts, including an arrest for possession of cocaine earlier that year." Estrada Decl. ¶ 5. Estrada confirmed officer Montgomery's description of the events, i.e., Estrada heard Bell tell officer Montgomery that he was not on parole, observed Montgomery confirm that Bell was on parole, observed Bell refuse to submit to testing, heard Montgomery contact the FAT regarding his contact with Bell. After officer Montgomery arrested Bell, they transported him to jail.

Two days after Bell's arrest, his parole agent, Dexter Wiggins, received a fax from the FAT informing him of Bell's arrest and describing the circumstances of the arrest. Based on the information parole agent Wiggins received, he "determined that Bell had violated his parole by giving false information to peace officers and recommended that Bell continue on parole under supervision as of October 28, 2003." Wiggins Decl., ¶ 8. Wiggins "did not recommend a parole revocation hearing because Bell was not being charged with a new criminal offense and the violation was a relatively minor one." Id. at ¶ 9. Wiggins explained that not all parole violations result in a revocation and that the parole agent has the discretion to allow the parolee to continue on parole, which is what Wiggins did in Bell's case. Id. Wiggins did not determine that the police officers lacked a basis for arresting Bell. Wiggins states that this parolee's refusal to submit to anti-narcotics testing and refusal to provide an address to a police officer were parole violations.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to the claims occurred in Alameda County, which is located within the Northern District. This court has federal question jurisdiction over this action asserting claims under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.")

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

Where, as is the situation with defendants' qualified immunity defense, the moving party bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. See Houghton v. Smith, 965 F.2d 1532, 1536 (9th Cir. 1992). He must establish the absence of a genuine issue of fact on each issue material to his affirmative defense. Id. at 1537; see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. When the defendant-movant has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

4

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge).

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. See id. at 631.

## DISCUSSION

A.  Defendant's Summary Judgment Motion

1.  The Heck Issue

Defendant Estrada contends that this action is barred by the Heck rule discussed below. The court disagrees.

The case of Heck v. Humphrey, 512 U.S. 477 (1994), held that a plaintiff cannot bring a civil rights action for damages for a wrongful conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, unless that conviction or sentence or other decision already has been determined to be wrongful. See id. at 486-87. A conviction or sentence may be determined to be wrongful by, for example, being reversed on appeal or being set aside when a state or federal court issues a writ of habeas corpus. See id. The Heck rule also prevents a person from bringing an action that -- even if it does not directly challenge the conviction or other decision -- would imply that the conviction or other decision was invalid. The practical importance of this rule is that plaintiffs cannot attack their convictions or sentences in a civil rights action for damages and instead must have successfully attacked the decision before filing the civil rights action for damages. Heck generally bars claims

5

challenging the validity of an arrest or prosecution that led to a conviction, as well as the conviction itself. See Guerrero v. Gates, 357 F.3d 911, 918 (9th Cir. 2004) (Heck barred plaintiff's claims of wrongful arrest, malicious prosecution and conspiracy among police officers to bring false charges against him). Heck also bars a challenge to the validity of confinement resulting from a parole revocation hearing until the parole board's decision has been reversed, expunged, set aside or called into question. See Littles v. Bd. of Pardons and Paroles Div., 68 F.3d 122, 123 (5th Cir. 1995) (revocation of parole).

Heck does not apply to this case because Bell's success here would not undermine a conviction or sentence. The inapplicability of Heck becomes apparent when one asks "what decision would be called into question by a favorable determination in this action?" Neither parole revocation nor conviction occurred here. The only decisions that might be called into question if Bell prevailed are the officers' decision to arrest him and the parole agent's decision that Bell had violated parole but should continue on parole. The decisions to detain and arrest an individual are not the kind of decisions to which Heck applies when the arrest has not led to a conviction; otherwise, all false arrest claims would be barred by Heck. The parole agent's decision that Bell had violated parole but should continue on parole also is not the kind of decision to which Heck applies. Defendants urge that the parole agent's decision that parole has been violated is like a parole revocation decision, but the analogy is not a good one and the court declines to expand Heck's reach to cover Bell's case. The parole agent's decision is but an interim step in the process of a parole revocation decision and is like a prosecutor's decision not to prosecute one arrested for a minor crime, and neither decision is subject to the Heck bar. The parole agent's decision could not be challenged in a federal habeas petition and it is not clear that it could be challenged on direct appeal or habeas in state court. Moreover, Heck noted that the § 1983 claim for wrongful conviction under consideration was analogous to a claim for the tort of malicious prosecution and was different from a claim for false arrest; on the latter claim, the damages would cover only the time from the initial detention until issuance of process or arraignment. See Heck, 512 U.S. at 484. This court declines to expand Heck to reach a situation which Heck itself distinguished. Lastly, one of the main reasons for the Heck rule – a desire to avoid inconsistent

6

judicial decisions – is absent where there has only been a parole agent's decision that might be called into question. The inapplicability of <u>Heck</u> is not because Bell's time in custody was too short to mount a habeas challenge but instead because there was no parole revocation decision or conviction that he could challenge that would affect the fact or duration of his confinement.

### 2. The Fourth Amendment Claim

The Fourth Amendment to the U.S. Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. In the case of a parolee, the standard for a search or seizure drops from "probable cause" to "reasonable suspicion." <u>See</u> <u>United States v. Knights</u>, 534 U.S. 112, 121 (2001) (no more than reasonable suspicion necessary for a search of probationer's house); <u>Moreno v. Baca</u>, 400 F.3d 1152, 1159 (9th Cir. 2005) ("Because of the similarity of their relationship vis-a-vis the government, we have treated parolees and probationers essentially the same for the purpose of Fourth Amendment analysis.") The Fourth Amendment "requires that a law enforcement officer must, at minimum, have a reasonable suspicion that a parolee has engaged in criminal wrongdoing or violated his parole prior to arresting him or conducting a search of his person." <u>Id.</u> at 1163.

The facts and circumstances that form the basis for the seizure must be known to the officer at the time he conducts the seizure, and may not be facts and circumstances learned after the fact (e.g., when the existence of a warrant is not learned until the arrestee is later booked at a police station). <u>Id.</u> at 1164-65. The question then is whether those facts and circumstances actually known at the time would be sufficient to warrant an objectively reasonable officer to believe that the suspect is committing or has committed a crime or parole violation. <u>See id.</u> When making reasonable suspicion determinations, a reviewing court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002) (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981)) "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions

7

about the cumulative information available to them that might well elude an untrained person." Arvizu, 534 U.S. at 273 (internal quotation marks omitted) (analyzing a Terry stop). Although an officer cannot rely on a mere "hunch," "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of evidence standard." Id. at 274. Even factors susceptible in isolation to innocent explanation may, when taken together, give rise to a reasonable suspicion justifying a detention. Id. at 277-78. An officer need not ignore the characteristics of a location or the behavior of the person detained. See, e.g., Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000) (officer may stop person who flees upon seeing police officers patrolling an area known for heavy trafficking).

At some point during the officers' encounter with Bell on October 25, there was a seizure within the meaning of the Fourth Amendment. Knowing exactly when that seizure occurred is important to the Fourth Amendment analysis because the inquiry is based on the facts and circumstances known to the officers at that point in time. The parties spend little effort attempting to identify exactly when the seizure occurred.[1] The parties appear to peg the seizure at opposite ends of the time continuum, with Bell suggesting it occurred when the officers first saw him and the officers suggesting it occurred after they had talked to Bell and a parole hold had been placed on him. The failure of the parties to focus on identifying the precise moment of the seizure does not preclude summary judgment, however, because Bell's suggestion is wrong as a matter of law, and there was sufficient justification for the arrest at any of several other points in the time continuum of the encounter. The relevant points on the continuum of the encounter that will be considered are when (1) the officers saw and approached Bell, (2) the officers began questioning

---

[1] A seizure to which the Fourth Amendment applies may occur even if no formal arrest is made. An arrest, which normally requires probable cause, has occurred "if a reasonable person would conclude that he was not free to leave after brief questioning." Stevens v. Rose, 298 F.3d 880, 883-84 (9th Cir. 2002) (citations omitted). A less-intrusive Terry stop, see Terry v. Ohio, 392 U.S. 1, 27 (1968), is constitutionally permissible if the officer has a "reasonable suspicion" that the person detained is engaged in criminal activity. Cf. Bingham v. City of Manhattan Beach, 341 F.3d 939, 946-47 (9th Cir. 2003) (traffic stop). Ordinarily, it would be necessary to determine whether the plaintiff initially was subjected to a Terry stop; however, because the level of suspicion required for a seizure of a parolee is the lower reasonable suspicion, it does not appear to be necessary to determine whether Bell's encounter started as a Terry stop or an arrest.

8

Bell, (3) the questions and answers concluded after a computer check on Bell's parole status and a parole hold was issued, and (4) Bell was put in the police car to be taken to the police station.

When The Officers First Saw Bell: Bell urges that defendants did not have "a founded suspicion that plaintiff was involved in criminal activity before approaching plaintiff." Opposition Brief, p. 13. He misunderstands the law, as there is no constitutional requirement that a police officer have a particular level of suspicion before he observes and merely approaches a person on a public sidewalk. A seizure involves some restraint of liberty such that the person reasonably believes he is not free to leave. See United States v. Mendenhall, 446 U.S. 544, 553-54 (1980). If Bell's position was adopted, police officers would violate the Fourth Amendment on a daily basis by merely looking at people as they walked along sidewalks. Not surprisingly, the Fourth Amendment does not require that police officers suspect criminal activity before they look at people or even walk up to them. See generally id. at 554 ("characterizing every street encounter between a citizen and the police as a 'seizure,' . . . would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices."). In light of the absence of any words spoken or gestures made by the officers that signaled that Bell was not free to leave, there was no Fourth Amendment seizure.

When The Questioning Began: The next potential point when the seizure could have occurred was when the officers looked at Bell and began to ask their first question. It is undisputed that at this point in time, Bell was in an area known for heavy narcotic activity and exhibiting rapid speech, fidgety movements, and sweating. Bell does not dispute that these symptoms were consistent with drug usage. The undisputed evidence also shows that the officers recognized Bell and thought he was on parole on a drug charge when they first encountered him. The facts and circumstances known to officers Estrada and Montgomery at the moment they started to ask a question provided a reasonable cause to suspect criminal activity and a parole violation and therefore were constitutionally sufficient to support a seizure. Cf. Illinois v. Wardlaw, 528 U.S. at 124-25 (reasonable suspicion existed to stop person who flees upon seeing officers patrolling an area known for heavy drug trafficking); but cf. Moreno, 400 F.3d at 1164-65

(officers lacked reasonable suspicion to detain and search individual observed walking in a high crime area and appearing nervous when he saw police car; warrant for his arrest didn't count because it was not discovered until later).

Defendants presented evidence that they believed Bell was on parole because they both previously had encountered Bell: officer Estrada had arrested him four months earlier for possession of cocaine and officer Montgomery had arrested him four years earlier.[2]

Bell suggests in his opposition brief that defendants engaged in revisionist history because they only recently learned that they had prior contacts with Bell. He contends that defendants only became aware of the earlier contacts because Bell made a discovery request for an arrest report that showed he previously had been arrested by defendant Estrada. See Opposition Brief, pp. 11-12. This is mere speculation and is insufficient to raise a triable issue of fact. Additionally, the fact that Bell remembered who arrested him (so that he could request the document in discovery) cuts against, rather than in favor of, Bell because Bell's ability to remember having been arrested by Estrada makes it more (rather than less) likely that Estrada remembered the same event. Furthermore, documents prepared near the time of the arrest that all contemplate Bell being arrested in connection with a parole violation support the inference that his parolee status was known to the officers on October 25, 2003. See e.g., Montgomery Decl., Exh. A (arrest report); Wiggins Decl., Exh. A (parole hold report) and Exh. B (parole agent's report).

Bell also contends that there is a triable issue of fact as to whether defendants recognized

---

[2] Bell concedes that both officers arrested him before the October 25, 2003 encounter. See Opposition Brief, p. 10:7-8.

Bell may have made himself particularly memorable to officer Montgomery by suing him for another allegedly wrongful arrest. See Bell v. Fought, No. C00-20964 RMW. Although based on a 1999 arrest, that action continued into 2003, with summary judgment being entered in March 2003 and Bell's appeal being dismissed just a few weeks before the October 25, 2003 arrest at issue in the present case.

Similarly, Bell may have made himself particularly memorable to officer Estrada by his behavior during his arrest on June 21, 2003 for possession of narcotics during which a parole hold was noted. See Estrada Decl., Exh. A. Estrada's report for the June 21, 2003 arrest stated: "Once I advised Bell he was going to jail, he began venting and became irate, yelling, he had a lawsuit against OPD already and was going to file another." Id.

him because they didn't note that fact in the arrest report. He urges that the absence of a statement in the arrest report that either officer recognized him as a parolee shows that they did not know he was on parole at the time they stopped him. The failure to note on the police report that the officers recognized Bell from earlier encounters is not alone enough to raise a triable issue of fact that they did not recognize him.

<u>When The Questioning Ended And A Parole Hold Was Issued For Bell</u>: By the time the questioning had concluded, additional information known to the officers included the following facts and circumstances that easily satisfied the reasonable suspicion standard (and the probable cause standard, if that had applied) to seize Bell. Bell initially denied being on parole and did not admit to being on parole until officer Montgomery checked on his computer, received information that Bell was on parole and told Bell he would call Sacramento to confirm that parole status. Bell refused to submit to a urine test which officer Montgomery instructed him to submit to pursuant to the anti-narcotic testing condition of his parole. Bell does not dispute that he refused to submit to any field sobriety test and refused to give officer Montgomery his current address. At that point, the officers knew enough facts that would permit any reasonable officer to reasonably suspect Bell had violated the terms of his parole.[3]

Bell tries to raise a triable issue of fact by urging that there is a triable issue of fact that defendants had probable cause to arrest him. But this just restates the legal question and is not evidence to show the existence of a triable issue of fact. Bell was informed by the Order of Service that he had to come forward with evidence in support of his case to avoid summary judgment. While a plaintiff can get past the initial pleading stage with very little factual detail, he cannot do so at the summary judgment stage. It almost never is enough at the summary judgment stage for a plaintiff to say something to the effect of "defendants are lying." Instead, once defendants meet their initial burden, a plaintiff must present evidence to show a version of the

---

[3]Before Bell answered any questions, the initial basis to detain him would have been suspected drug usage that would have been both criminal activity and a parole violation. By the time he finished answering questions, the officers had received information to support a reasonable suspicion Bell had also violated parole by denying he was on parole, refusing drug testing and refusing to provide his address.

United States District Court
For the Northern District of California

events that does not harmonize with the defendants' version and shows a factual dispute that is material and therefore needs to be decided by a jury. Bell did not do so.

<u>When Bell Was Put In The Police Car</u>: An arrest/seizure covered by the Fourth Amendment occurred no later than the time Bell was put in the police car for transportation to the police station. Bell has not raised a triable issue of fact that he was subject to a seizure before he was put in the police car because the only evidence as to the sequence of events is the sequence of events described by defendants in their declarations in support of their motion. That evidence shows that Bell was not arrested until the end of the street encounter and after a parole hold had been placed on him by the FAT for violating parole and after he had violated the terms of parole by denying he was on parole, refusing to take drug and sobriety tests, and refusing to provide an address. Once all that had occurred, the officers had reasonable suspicion and even probable cause to arrest him as a matter of law.

Bell argues that his arrest was improper because the parole agent determined he had not violated parole. This assertion misstates the evidence. The parole agent states that he determined that Bell had violated parole but determined that Bell should be continued on parole. Bell's self-serving denial is not evidence sufficient to raise a triable issue of fact.

On the undisputed evidence, defendants had reasonable cause to believe that Bell was engaged in criminal activity and parole violations when they began questioning him and at every point thereafter. Defendants therefore are entitled to judgment in their favor and against plaintiff on his Fourth Amendment claim.

### 3. Qualified Immunity Defense

The evidence in the record establishes that Bell's rights under the Fourth Amendment were not violated. Defendants therefore are entitled to prevail as a matter of law on their defense of qualified immunity. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known); Saucier v. Katz, 533 U.S. 194, 201 (2001) (threshold question in qualified immunity analysis is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?").

### B. Amendment Of The Complaint

In his original complaint, Bell claimed he had been wrongfully arrested by officer Estrada and another officer whose identity was not known to him. He used a Doe defendant moniker for this unidentified officer.

After defendant Estrada filed the motion for summary judgment, Bell filed a motion to amend to name Oakland police officer Noah Montgomery in place of the Doe defendant. Plaintiff filed a motion to amend his complaint and a motion for service of process on the newly named defendant, Noah Montgomery. The motion to amend is GRANTED and Noah Montgomery is added as a defendant. (Docket # 23.) The court will DENY the motion for service of process, however. (Docket # 18.) Service of process is no longer needed to adjudicate the dispute between plaintiff and defendants. The motion for summary judgment is based on declarations from both Noah Montgomery and Brett Estrada and as a result presents a complete picture of both defendants' version of the incident. Bell's opposition makes no effort to distinguish between the two defendants, and demonstrates that it was not filed with the understanding that he only needed to address his claim against officer Estrada. The issues having been fully briefed, the court can say with certainty that both officers are entitled to judgment in their favor and against Bell. There is no need to delay the resolution of this case by several months so that defendant Montgomery can be served with process, retain counsel (who would probably be the same as counsel for

13

Estrada), and file a separate motion for summary judgment that makes an argument and factual presentation identical to the one made by Estrada. The most practical approach therefore is to allow defendant Montgomery to be added as a defendant in place of the Doe defendant but not to waste the time and resources necessary to have him served with process.

Before the motion for summary judgment was filed, Bell moved to extend the briefing schedule to allow him to discover the name of the Doe defendant. The motion for an extension of time is DENIED as moot because Bell was able to accomplish the task without an extension of time. (Docket # 13.) The briefing schedule did not need to be changed because Bell was able to learn the name of the Doe defendant, file a motion to amend to add the newly-identified defendant, and file his opposition to the motion for summary judgment by the deadline.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. (Docket # 16.) Plaintiff's motion for leave to file an amended complaint is GRANTED. (Docket # 23). Plaintiff's motion for an extension of the briefing schedule and for service of process are DENIED (Docket # 13 and # 18.) Judgment will now be entered in defendants' favor and against plaintiff. The clerk shall close the file.

IT IS SO ORDERED.

Dated: December 8, 2005

_____
SUSAN ILLSTON
United States District Judge